Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Justin Calabrese, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE  COMPANY
and GEICO CASUALTY COMPANY,

                    Plaintiffs,

        -against-

MED HELP SUPPLY, INC. and ELDAR
AKHMEDOV,

                  Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.: _____ (     )

**Plaintiffs Demand a Trial
by Jury**

## COMPLAINT

    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively referred to

hereinafter as "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants,

hereby allege as follows:

## INTRODUCTION

    1.    This action seeks to recover more than $70,000.00 that the Defendants wrongfully

have obtained from GEICO by submitting, and causing to be submitted, fraudulent claims

seeking payment for durable medical equipment and orthotic devices (e.g. cervical collars, lumbar-sacral supports, electronic muscle stimulator units, egg crate mattresses, etc.). These goods purportedly were provided to individuals ("Insureds") who were involved in automobile accidents and were eligible for insurance coverage under GEICO insurance policies.

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay more than $564,000.00 in fraudulent claims submitted through Med Help Supply, Inc. ("Med Help") because:

(i)      Defendant Med Help made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the durable medical equipment and orthotic devices it allegedly provided to Insureds in order to obtain from GEICO payment under the New York "No-Fault" laws to which it is not entitled;

(ii)     Defendant Med Help made false and fraudulent misrepresentations to GEICO by submitting charges for durable medical equipment and devices that never were dispensed to Insureds;

(iii)    Defendant Med Help regularly failed and/or refused to adequately provide full particulars of the nature and/or extent of the durable medical equipment and orthotic devices it purported to have supplied to Insureds; and

(iv)     Defendant Med Help often failed and/or refused to adequately respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

3.      The Defendants fall into the following categories:

(i)      Defendant Med Help is a New York corporation that purported to purchase durable medical equipment and orthotic devices from various wholesale durable medical equipment and orthotic device dealers.  Med Help then purportedly dispensed the equipment and orthotics to insureds while systematically submitting fraudulently inflated claims to GEICO and other New York automobile insurers.

(ii)     Defendant Eldar Akhmedov ("Akhmedov") owns Med Help and submitted fraudulently inflated bills seeking reimbursement for durable medical equipment purportedly dispensed by Akhmedov through Med Help.

(Med Help and Akhmedov are hereinafter collectively referred to as the "Defendants").

4.      As discussed below, the Defendants at all times have known that the claims for durable medical equipment ("DME") and orthotic devices submitted to GEICO were fraudulent because: (i) the charges intentionally were inflated based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws; (ii) the claims misrepresented the nature and quality of the DME and orthotic devices that were actually provided; and (iii) in many cases, the goods and related services billed to GEICO never were actually provided to the Insureds in the first instance.

5.      As such, the Defendants do not now have – and never had – any right to be compensated for their claims for DME and orthotic devices.  The chart attached hereto as Exhibit "1" sets forth a representative sample of more than 2,400 fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.  The Defendants' fraudulent scheme perpetrated against GEICO began in 2010 and has continued uninterrupted since that time.  Although not presently submitting bills, Med Help and Akhmedov continue to attempt collection on unpaid claims.  As a result of the scheme, GEICO has incurred damages of more than $70,000.00.

## THE PARTIES

### I.      Plaintiff

6.      Plaintiff, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.    Defendants

7.     Defendant Med Help Supply, Corp. is a New York corporation that operated at 2201 Avenue X, Brooklyn, New York which was its principal place of business. Med Help was incorporated in September 2010 and from that time through June 2011, knowingly submitted fraudulent claims to GEICO. Although no longer submitting bills to GEICO, Med Help continues to seek reimbursement on thousands of unpaid fraudulent claims.

8.     Defendant Akhmedov is a citizen of New York. At all relevant times herein, Akhmedov owned and controlled Med Help.

### JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

10.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

### ALLEGATIONS COMMON TO ALL CLAIMS

### I.    An Overview of the No-Fault Laws and Licensing Statutes

11.     GEICO underwrites automobile insurance in the State of New York.

12.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (collectively referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

4

13.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

14.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

15.     The No-Fault Laws obligate individuals and healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification in order to establish proof of their claims.

16.     The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 provides, in part, that "upon request by the Company, the eligible injured person or that person's assignee . . . shall (b) as may reasonably be required, submit to an examination under oath by any person named by the Company, and shall subscribe to same . . . , and (d) provide any other pertinent information that may assist the Company in determining the amount that is payable."

17.     The prescribed No-Fault policy endorsement set forth in 11 N.Y.C.R.R. § 65-1.1 also states that "[n]o action shall lie against the Company, unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage."

18.     In addition, 11 N.Y.C.R.R. § 65-3.5 states, in pertinent part, that:

(i)     Subsequent to the receipt of one or more of the completed verification forms, any additional verification required by the insurer to establish proof of claim shall be requested within 15 business days of receipt of the

prescribed verification forms.  Any requests by an insurer for additional verification need not be made on any prescribed or particular form. . . .

(ii)     The insurer is entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested.

(iii)    All examinations under oath . . . requested by the insurer shall be held at a place and time reasonably convenient to the applicant. . . . The insurer shall inform the applicant at the time the examination is scheduled that the applicant will be reimbursed for any loss of earnings and reasonable transportation expenses incurred in complying with the request.  When an insurer requires an examination under oath of an applicant to establish proof of claim, such requirement must be based upon the application of objective standards so that there is specific objective justification supporting the use of such examination

19.     Because an examination under oath is a condition of coverage, an insurer may deny a healthcare provider's or individual's claim for No-Fault Benefits if the healthcare provider or individual claimant refuses to appear for an examination under oath.

20.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3s and HCFA-1500 Forms submitted by healthcare providers to GEICO, and to all other insurers, must be verified subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    Regulations Governing Maximum Reimbursement for Durable Medical Equipment and Orthotic Devices

21.     Durable medical equipment generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes.  Although not always medically necessary, durable medical equipment often dispensed include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared heat lamps, lumbar cushions, orthopedic

car seats, transcutaneous electrical nerve stimulators ("TENs units"), thermophores (electrical moist heating pads), cervical traction units, and whirlpool baths.  Orthotic devices, a subgroup of DME, are instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee orthoses, ankle supports, wrist braces, and the like.

22.    The No-Fault Laws set forth maximum charges that may be submitted by healthcare providers for DME and orthotic devices. One of the primary purposes in limiting the maximum charges for DME and orthotic devices is to ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME and orthotic device charges. In a June 16, 2004 Opinion Letter, the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and orthotic device charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

(A copy of the June 16, 2004 Opinion Letter is attached as Exhibit "3.")

23.    Effective October 6, 2004, the maximum permissible charge for DME and orthotic devices is the fee payable for such DME and orthotic devices under the New York State Medicaid program at the time such DME and orthotic devices are provided. See 11 N.Y.C.R.R. (Appendix 17-C, Part F (a) (effective Oct 6, 2004)).

24.    If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable shall be the lesser of the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus

50 percent, or the usual and customary price charged to the general public. See 11 N.Y.C.R.R. (Appendix 17-C, Part F (a) (effective Oct. 6, 2004)).

25.     Insurers such as GEICO are entitled to receive a proper proof of claim. See 11 N.Y.C.R.R. § 65-3.8(f). To be eligible for payment, a claim seeking reimbursement for DME and/or orthotic devices must include a description of the "full particulars of the nature and extent" of the items and services for which payment is sought. See 11 N.Y.C.R.R. § 65-1.1.

**III.   The Defendants' Fraudulent Scheme**

26.     The Defendants masterminded a scheme through which Med Help submitted more than $682,000.00 in fraudulent claims to GEICO seeking reimbursement for DME and orthotic devices.  To date, the Defendants have stolen more than $70,000.00 and there are more than $564,000.00 in fraudulent claims that have yet to be adjudicated.

27.     The fraudulent scheme perpetrated by the Defendants involves the participation of physicians and/or chiropractors, the Defendants as well as various DME wholesale companies. In coordination with the various wholesale companies, the Defendants paid kickbacks to multi-disciplinary No-Fault clinics in the New York metropolitan area that purport to provide treatment to high volumes of Insureds.  In exchange for the kickbacks, physicians and/or chiropractors associated with the Clinics prescribed large amounts of DME and orthotic devices that purportedly were supplied to Insureds by the Defendants.  The prescriptions were never given to the Insureds, but as part of the scheme, they were routed directly to the Defendants by the Clinics to ensure that the Insureds did not fill the prescriptions with legitimate DME and orthotic device retailers.

28.     In exchange for the kickbacks, the Clinics also ensured that their associated physicians and/or chiropractors prescribed DME and orthotic devices that *were not* covered by the New York State Medicaid fee schedule, thus enabling the Defendants to seek reimbursement

on the DME and orthotic devices based on their purported acquisition costs with respect to such goods.

29.     To the extent that the physicians and/or chiropractors associated with the Clinics prescribed DME and orthotic devices that *were* covered by the New York State Medicaid Fee Schedule, the Clinics intentionally wrote the prescriptions in a generic, non-descript manner thus enabling the Defendants to: (i) misrepresent the nature and quality of the items intended for the patient and (ii) misrepresent the nature and quality of the items that they actually dispensed so as to claim entitlement to a higher fee payable.

30.     In order to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants entered into secret agreements with various wholesale companies whereby – in exchange for a share in the profits of the fraud – the wholesale companies provided the Defendants with low-quality DME that cost a mere fraction of the Defendants' true "acquisition cost". These fraudulently inflated wholesale invoices: (i) stated wholesale prices for the DME and orthotic devices that were far in excess of the actual wholesale price of the DME and orthotic devices; and (ii) deliberately omitted any mention of the make and model of the DME and orthotic devices.

31.     The wholesale companies also sold fraudulently inflated wholesale invoices (without actually exchanging any DME) to the Defendants knowing that they could and would be used by the Defendants in support of their claims for reimbursement that were ultimately submitted to GEICO.

32.     To create the illusion that the Defendants actually paid the inflated prices on the wholesale invoices, the Defendants went so far as to issue checks to the various wholesale companies for the full invoice amounts, and then submitted the checks to GEICO and other New York automobile insurers as proof of payment. The payment methodology was nothing more

than a façade as the wholesale companies converted these checks to cash through various methods, then regularly paid "rebates" to the Defendants.  Although the wholesale companies kept a portion for themselves, a majority of the payments was used by the Defendants to purchase prescriptions from Clinics and to maintain a steady flow of cash to facilitate the scheme.

33.     In the event that the Defendants did actually purchase DME from the wholesale companies, much of the DME were inexpensive products manufactured in China by companies like Jingtong, then imported, packaged and distributed under names such as "Frankies", "Yoramed" and "Painease" and products.

34.     Nevertheless, the Defendants systematically represented that the inexpensive DME obtained from the wholesale companies and ultimately dispensed to GEICO Insureds were high-quality, expensive products by submitting charges that were many times more than five times the true value of the products.

35.     The Defendants then created and submitted thousands of bills that – like the underlying wholesale invoices – deliberately omitted any meaningful information regarding the DME and orthotic devices, including the manufacturer, make and model of the DME and orthotic devices that the Defendants purportedly dispensed to Insureds.

36.     The Defendants' creation and submission of such generic billing prevented GEICO and other insurers from identifying the manufacturer, make and model of the DME and orthotic devices and concealed the fact that: (i) the DME and orthotic devices dispensed by the Defendants, to the extent that they were provided at all, were inexpensive low-quality products that cost a mere fraction of what was represented; (ii) the Defendants, in virtually every instance, charged GEICO and other insurers far more than the maximum permissible amounts for the

DME and orthotic devices that were supplied; and (iii) the Defendants frequently billed GEICO and other insurers for DME and orthotic devices they never supplied in the first instance.

37.     To further conceal the scheme, the Defendants also often failed to provide GEICO and/or refused to respond to repeated requests made by GEICO seeking information such as meaningful wholesale invoices containing descriptions of goods provided (i.e., make, model and manufacturer), proof of payment and additional information that would be necessary to determine whether the charges submitted by the Defendants were legitimate and the result of bona fide arms-length transactions between the Defendants and the various wholesale companies.

**IV.     Med Help's Scheme to Defraud GEICO**

38.     Beginning in September 2010 Med Help and Akhmedov entered into kickback arrangements with several Clinics, and secret agreements with various wholesale companies that supplied fraudulent and inflated wholesale invoices to Med Help and Akhmedov in exchange for a share in the profits of the scheme.

39.     In exchange for payments from Med Help, the Clinics – including, but not limited to, facilities located at 535 Utica Avenue, Brooklyn, New York, 1552 Ralph Avenue, Brooklyn, New York, 8413 Avenue K, Brooklyn, New York and 89-16 175th Street, Jamaica, New York – directed their associated physicians and/or chiropractors to: (i) prescribe large amounts of virtually identical DME and orthotic devices to Insureds, without regard to the Insureds' symptoms; (ii) to prescribe DME for which the New York State Medicaid program has not established a schedule of fees payable; and (iii) to issue generic prescriptions for DME and orthotic devices, omitting specific descriptions of the devices required so as to permit Med Help and Akhmedov to unilaterally select what DME or orthotic devices to dispense.

40.     Simultaneously, pursuant to their agreement with Med Help and Akhmedov, and in exchange for a share in the profits of the scheme and to support the efforts of the Defendants to negotiate kickback arrangements with the Clinics, various wholesale companies provided Med Help and Akhmedov with fraudulent wholesale invoices that were used by Med Help and Akhmedov as a basis for their calculations and representations that their claims for reimbursement were in accordance with the No-Fault laws when, in fact, they were not.

41.     In cases where the New York State Medicaid program *has not* prescribed a fee payable for a given item or a class of items, Med Help and Akhmedov relied on the prices stated in the non-descript and fraudulently inflated invoices provided by the various wholesale companies to seek fees higher than what they were legally entitled by charging GEICO 150% of the inflated wholesale price. For example:

(i)     **EMS Units** – Med Help and Akhmedov systematically submitted charges of $684.00 for EMS Units representing that Med Help's "acquisition cost" for the units was approximately $456.00 per unit. In reality, Med Help likely never paid its wholesalers more than $75.00 because various EMS Units are available to the general public through internet vendors at prices ranging from $117.00 and $156.00 – depending on the model selected. (Representative examples of the bills, prescriptions and delivery receipts are attached as Exhibit "3.")

(ii)    **Infrared Heat Lamps** – Med Help and Akhmedov systematically submitted charges of $214.50 for infrared heat lamps representing that Med Help's "acquisition cost" for the devices was approximately $143.00 per lamp. In reality, Med Help likely never paid its wholesalers more than $20.00 for the lamps because the lamps dispensed by Med Help were inexpensive Painease heat wands that are available to the public for approximately $40.00. (Representative examples of the bills, prescriptions and delivery receipts are attached as Exhibit "3.")

(iii)   **Whirlpools** – Med Help and Akhmedov systematically submitted charges of $500.00 for "whirlpools" representing that Med Help's "acquisition cost" for the whirlpools was approximately $333.00 per whirlpool. In reality, Med Help likely never paid its wholesalers more than $40.00 per item because the "whirlpools" dispensed by Med Help were inexpensive, portable over-the-tub air-blowers that were manufactured in China by Jingtong, and are available to the public for approximately $60.00. (Representative examples of the bills, prescriptions and delivery receipts are attached as Exhibit "3.")

(iv)   **Cold Water Therapy Units** – Med Help and Akhmedov systematically submitted charges of $479.50 for Cold Water Circulating Units (with pumps) representing that Med Help's "acquisition cost" for the units was approximately $320.00.   However, Med Help likely never paid its wholesalers more than $100.00 for the units because legitimate water circulating units are readily available to the public for approximately $200.00 – much less than the imitation "Frankies" Water Jugs actually dispensed by Med Help.   (Representative examples of the bills, prescriptions and delivery receipts are attached as Exhibit "4.")

(v)   **Car Seats** – Med Help and Akhmedov systematically submitted charges of $193.50 for car seats representing that Med Help's "acquisition cost" for the car seats was approximately $129.00 per seat.   However, Med Help likely never paid its wholesalers more than $25.00 per seat because the car seats purportedly dispensed by Med Help are inexpensive "Economy Seat Cushions" that are available to the public for less than $30.00.   (Representative examples of the bills, prescriptions and delivery receipts are attached as Exhibit "5.")

(vi)   **Lumbar Cushions** – Med Help and Akhmedov systematically submitted charges of $92.00 for lumbar cushions representing that Med Help's "acquisition cost" for the cushions was approximately $63.00 per cushion.   In fact, Med Help never paid its wholesalers more than $15.00 for the cushions because such products are available to the public for less than $30.00.   (Representative examples of the bills, prescriptions and delivery receipts are attached as Exhibit "5.")

(vii)   **Massagers** – Med Help and Akhmedov systematically submitted charges of $192.00 for massagers representing that Med Help's "acquisition cost" for the units was approximately $128.00 per massager.   In reality, Med Help likely never paid its wholesalers more than $20.00 for the massagers because the massagers dispensed by Med Help were inexpensive Painease massaging wands that are available to the public for approximately $40.00. (Representative examples of the bills, prescriptions and delivery receipts are attached as Exhibit "6.")

42.   In cases where the New York State Medicaid program *has* prescribed a fee payable for a given item or a class of items, Med Help and Akhmedov relied on the vague and generic prescriptions issued by the Clinics to misrepresent the nature of the items actually prescribed and furthermore misrepresented the item that the Med Help and Akhmedov purportedly dispensed so as to claim entitlement to a higher fee payable.  For instance:

(i)   **Bed Boards** – Med Help and Akhmedov systematically submitted charges of $118.50 using HCPCS Code E0274 pursuant to prescriptions calling for "bed boards".  Because the bed boards prescribed are inexpensive, folding, light-weight

13

boards (designed for use *under* a mattress), Med Help and Akhmedov intentionally and falsely characterized the bed boards as *over-bed tables* so as to claim reimbursement at a higher fee despite the fact that over-bed tables were never actually dispensed. In fact, the bed boards dispensed by Med Help and Akhmedov are not included in the Fee Schedule, and therefore, had Med Help and Akhmedov dispensed what was prescribed, they would only be entitled to the **lesser** of: (i) the acquisition cost to the provider plus 50%; or (ii) the usual and customary price charge to the general public – approximately $30.00. (Representative examples of the bills, prescriptions and delivery receipts are attached as Exhibit "6.")

(ii)    **Egg Crate Overlays** – Med Help and Akhmedov systematically submitted charges of $105.00 using HCPCS Code E0272 pursuant to prescriptions calling for "egg crate mattresses". Not only is $97.50 the maximum reimbursable fee for an item assigned to Code E0272, but the product assigned to HCPCS Code E0272 is a thick (5 inches or greater) foam/rubber mattress that acts as a *substitute* for a traditional mattress and is a more substantial and expensive product than the thin (2-inch), inexpensive egg crate *mattress overlays* prescribed and ultimately dispensed by Med Help. Such items should more properly be coded E0199 – a product with an assigned fee of only $19.48. (Representative examples of the prescriptions, bills and delivery receipts are attached as Exhibit "6.")

(iii)    **Cervical Collars** – Med Help and Akhmedov systematically submitted charges of $85.00 using HCPCS Code L0172 pursuant to prescriptions calling for "cervical collars". The product represented by HCPCS Code L0172 is a *two-piece, semi-rigid* collar that is more sophisticated and more expensive than the basic foam collars indicated on the prescriptions and which have an established fee payable of $6.80. (Representative examples of the prescriptions, bills and delivery receipts are attached as Exhibit "6.")

(iv)    **Custom Fitted Lumbosacral Supports** – Med Help and Akhmedov systematically submitted charges of $230.86 using HCPCS Code L0633 pursuant to prescriptions calling for "LSOs". The product represented by HCPCS Code L0633 is a complex, *custom-fitted* LSO with *rigid* posterior and lateral frames that require fitting and adjustment services from the provider. Such LSOs are much more sophisticated than basic, flexible elastic LSOs which were prescribed, likely dispensed by Med Help and which have an established fee payable of $65.92. (Representative examples of the prescriptions, bills and delivery receipts are also attached as Exhibit "6.")

43.    Furthermore, Med Help and Akhmedov generated and submitted bills to GEICO seeking reimbursement for goods that were never actually dispensed to GEICO Insureds.

44.    Finally, Med Help and Akhmedov generated delivery receipts indicating that they delivered the DME and orthotic devices to the Insureds' homes however Med Help's bills

indicate that the goods were dispensed to the patients at the various Clinics. Upon information and belief, the Insureds were required to sign blank "delivery receipts" and assignments of benefits forms as a condition precedent to receiving the DME and orthotic devices, notwithstanding the fact that the "delivery receipts" were false.

## IV. The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

45.     The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and orthotic devices to Insureds, and their actual submission of charges to GEICO.

46.     To induce GEICO to promptly pay the charges for the DME and orthotic devices, the Defendants have gone to great lengths to systematically conceal their fraud. Specifically:

(i)     The Defendants deliberately failed to submit wholesale invoices with their initial bill submissions, thereby concealing the amounts that they actually paid for the DME and orthotic devices, the manufacturer, make, model, size, and quality of the goods, and the actual value of the goods in the legitimate marketplace. At the same time, the Defendants obtained fraudulent wholesale invoices from one or more of DME wholesale companies, stating prices far in excess of those actually paid by the Defendants, which were produced to the extent necessary to support the fraudulent charges.

(ii)    To the extent that the New York State Medicaid program established fees payable for a given class of DME and orthotic devices, the Defendants misrepresented in the billing submitted to GEICO that they supplied more expensive items from the middle or top end of the class, rather than the inexpensive, basic items that actually were supplied.

(iii)   The Defendants submitted false delivery receipts in support of their billing that purported to demonstrate that the Insureds acknowledged receipt of the DME and orthotic devices, and delivery to their respective homes. Not only did these delivery receipts falsely state that the Insureds took delivery of the goods at their homes – thereby concealing the fact that the goods were handed to Insureds at the Clinics – they also deliberately omitted any mention of the manufacturer, make, model, size, or quality of the goods.

(iv)    The Defendants' fraudulent concealment also is manifest in their failure to disclose the existence of the kickback arrangements with the Clinics.

15

(v)     Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that Med Help submit additional information regarding the wholesale prices, descriptions of goods provided (i.e., make and model), proof of payment and documentation necessary to determine whether the charges submitted through Med Help were legitimate. Nevertheless, in an attempt to conceal their fraud, the Defendants systematically failed and/or refused to respond to repeated requests for verification of the charges submitted through Med Help, including but not limited to requests for examinations under oath.

47.    To induce GEICO to promptly pay the fraudulent charges, the Defendants, routinely file expensive and time-consuming litigation against GEICO and other insurers if the fraudulent charges are not promptly paid in full, despite the fact that the Defendants are aware that their billing and claims are fraudulent.

48.    GEICO is under a statutory and contractual obligation to promptly and fairly process claims within 30 days.  The documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations, omissions, and acts of fraudulent concealment described above, were designed to and did cause GEICO to justifiably rely on them.  As a proximate result, GEICO has incurred damages of more than $70,000.00 based upon the fraudulent charges.

49.    Because of the material misrepresentations and other affirmative acts taken by the Defendants to conceal their fraud from GEICO, GEICO did not discover and should not reasonably have discovered that their damages were attributable to fraud until shortly before it filed this Complaint.

50.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claims denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

51.     In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Med Help; (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through Med Help, yet failed to obtain compliance with the request for additional verification; or else (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through Med Help, or else to request additional verification of those claims, has not expired.

## FIRST CAUSE OF ACTION AGAINST MED HELP
### (Declaratory Judgment Under 28 U.S.C. § 2201)

52.     GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 51 of this Complaint as if fully set forth at length herein.

53.     There is an actual case in controversy regarding more than $564,000.00 in fraudulent billing for DME and orthotic devices that allegedly have been provided to GEICO's Insureds.

54.     GEICO contends that Med Help has no right to receive payment for any pending bills they have submitted because:

(i)     Med Help made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the durable medical equipment and orthotic devices it allegedly provided to Insureds in order to induce GEICO into paying Med Help "No-Fault" reimbursement to which Med Help was not entitled;

(ii)    Med Help made false and fraudulent misrepresentations to GEICO by submitting charges for durable medical equipment and devices that never were dispensed to Insureds; and

(iii)   Med Help failed and/or refused to respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

55. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i) Med Help has no right to receive payment on any pending bills submitted to GEICO because it knowingly made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the durable medical equipment and orthotic devices it allegedly provided to Insureds in order to induce GEICO into paying Med Help "No-Fault" reimbursement to which Med Help was not entitled;

(ii) Med Help has no right to receive payment on any pending bills submitted to GEICO because it knowingly made false and fraudulent misrepresentations to GEICO by submitting charges for durable medical equipment and devices that never were dispensed to Insureds; and

(iii) Med Help failed and/or refused to respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

## SECOND CAUSE OF ACTION AGAINST MED HELP AND AKHMEDOVV
### (Common Law Fraud)

56. GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 55 of this Complaint as if fully set forth at length herein.

57. Med Help and Akhmedov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for DME and orthotic devices.

58. The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i) In every claim for DME and orthotic devices for which the New York State Medicaid program has not established fees payable, the representation that Med Help's charges for DME and orthotic devices did not exceed the lesser of the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent, or the usual and customary price charged to the general public.

(ii)    In every claim for DME and orthotic devices for which the New York State Medicaid program has established fees payable, the representation that the goods represented in the billing actually were the goods supplied to Insureds.

(iii)   In every claim, concealment of the fact that the DME and orthotic devices actually provided to Insureds were inexpensive, low-quality goods, rather than the far more expensive goods for which billing was submitted.

(iv)    In every claim, concealment of the fact that Med Help was rebated a large percentage of the money that it represented to have paid to various DME wholesale companies.

(v)     In every claim, concealment of the fact that the DME and orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Med Help and Akhmedov paid kickbacks to the Clinics to induce the Clinics to direct their associated physicians and chiropractors to: (a) prescribe large amounts of medically unnecessary DME and orthotic devices; (b) primarily prescribe DME not covered by the New York State Medicaid fee schedule; and (c) with respect to DME and orthotic devices covered by the New York State Medicaid Fee Schedule, write the prescriptions in a generic non-descript manner, all of which was designed to permit Med Help and Akhmedov to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to GEICO and other New York automobile insurers.

59.     Med Help and Akhmedov made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws, or that were far in excess of the charges that otherwise would be compensable under the No-Fault Laws.

60.     GEICO justifiably relied on Med Help's and Akhmedov's false and fraudulent representations, and as a proximate result has incurred damages of more than $70,000.00 based upon the fraudulent charges.

61.     The extensive fraudulent conduct of Med Help and Akhmedov demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

62.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION AGAINST MED HELP AND AKHMEDOVV
### (Unjust Enrichment)

63.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 62 above.

64.     As set forth above, Med Help and Akhmedov engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

65.     When GEICO paid the bills and charges submitted by or on behalf of Med Help for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Med Help and Akhmedov.

66.     Med Help and Akhmedov have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

67.     Retention of GEICO's payments by Med Help and Akhmedov violates fundamental principles of justice, equity and good conscience.

68.     By reason of the above, the Med Help and Akhmedov have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $70,000.00.

## JURY DEMAND

69.     Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Med Help has no right to receive payment for any pending bills submitted to GEICO totaling no less than $564,000.00;

B.      On the Second Cause of Action against Med Help and Akhmedov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $70,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.      On the Third Cause of Action against Med Help and Akhmedov, more than $70,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
        January *3l*, 2013

                                 RIVKIN RADLER LLP

                                 By:_____
                                     Barry I. Levy , Esq
                                     Michael A. Sirignano, Esq.
                                     Justin A. Calabrese, Esq.
                               926 RXR Plaza
                               Uniondale, New York 11556-0926
                               Telephone:    (516) 357-3000
                               Facsimile:    (516) 357-3333

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company GEICO General Insurance Company and GEICO Casualty Company*

2630964 v1